Next case will be 091344 Taltech LTD v. Esquel Apparel. Mr. West. Thank you, your honor. May it please the court. The keys to understanding why there is no inequitable conduct or exceptional case here lie in the claims of the Tal patent and its prosecution history. The independent claims which determine patentability provide the reference point for determining materiality. The prosecution history allows one to discern what arguments were made for patentability and it also tells you what the examiner's reasons for allowance were. The court in this case applied a legally erroneous analysis in determining materiality and cumulativeness. It in fact did not follow this court's jurisprudence after this court remanded the case for one specific reason. This court's jurisprudence makes very clear that any analysis of materiality and cumulativeness requires several things. It requires not only a comparison of the unsighted prior art and the sighted prior art, but it also requires a comparison of both with the claims of the patent and the prosecution history. And that's what the district court did not do here. It did not follow the proper analysis. It only looked at differences between the prior art, the sighted prior art and the unsighted prior art and found some differences. But because it failed to compare those to the claims of the patent, it failed to understand that those quote specific differences or more specific differences that it found were not relevant at all and were not material. Well, you're arguing materiality, but as I'm the only member of this panel who wasn't on the prior panel, I'll raise the question with you. Wasn't our remand limited to determining whether the German patent was cumulative, not whether the distinctions were material? Well, yes, and that is the fundamental question and the district court applied the wrong analysis to that. Because in trying to determine whether the unsighted prior art was cumulative to the sighted prior art or not, it didn't take the claims of the patent or the prosecution history into account. You can look at its decision. You won't find any mention of the prosecution history. You will find only one bare fleeting reference to the independent claims. And even there, the court admitted that the sighted prior art disclosed exactly what was in the claim, namely a thermoplastic thermal adhesive. So what the district court did was jump to the dependent claims for its analysis. It looked at limitations which were only in the dependent claims, which had nothing to do with patentability. There was never any argument made based on them. And that was another legal error because dependent claims do not determine materiality. This predecessor court's decision in the Stevenson v. ITC case held that a dependent claim could not be a basis for materiality. And certainly that's true where no argument was made in the prosecution history that would have made it relevant to patentability. So the district court committed a series of legal errors here that totally undermined the correctness of its decision. It's reversible error both for legal reasons and because there are a plethora of clearly erroneous fact findings that are simply not supported by evidence. And in that regard, I will turn to the intent to deceive issue. And we pointed out in our briefs, and I'll point out again, the district court cited no relevant evidence of an intent to deceive. All it pointed to were two things, its previous conclusion of Law 81, which dealt with an entirely different subject, the now-discarded theory that a one-set stitch and one-top stitch was somehow material. But that was clearly disclosed in the rowbearer's reference, which the district court no longer contests. And so that conclusion has no bearing whatsoever, provides no evidence of an intent to deceive. But wasn't that a conclusion that was made in a prior case? Yes, it was, and it was based on the now-discarded notion that what was material was something that the district court has now abandoned. It was the theory that there was a one-set stitch and one-top stitch in the undisclosed raincoat seam, and that was somehow material. But on remand, we pointed out to the district court, wait a minute, that was exactly in rowbearer's, one-set stitch and one-top stitch. So the district court abandoned that as its theory for materiality and went to two new points, a raincoat armhole seam and a polyamide adhesive. But neither polyamide adhesive nor raincoat arm seam are in the independent claims. So they were never a basis for patentability. They would never have been considered important to the examiner. When the district court said they were material, it couldn't say material to what, because it had never looked at the independent claims. It couldn't find anything in the independent claims that it could possibly be material to. So there is no materiality. But going back to the intent to deceive, there's no evidence whatsoever. The only other point that the district court mentioned was the applicant's representative statement, and we pointed out repeatedly that that was simply a gross misunderstanding by the district court. It thought that applicant's representative meant the inventor when it really meant the attorney. But that's a matter in this group between you, isn't it? Well, I don't see how it can be. It's a matter of just looking at the language and understanding, as the examiner did, that applicant's representative was the attorney. The examiner himself referred to the attorney, Mr. McCain, as applicant's representative. So there was no confusion about that in the prosecution history. The examiner knew exactly who he was talking to and who was saying what. And even if the district court were right about it, it's not a basis for misrepresentation because they had told the, this was with respect to the disclosed raincoat scene in the prosecution, they told the examiner the disclosed raincoat scene was prior art. They admitted that. And so when they learned about it, or who learned about it, was totally immaterial to the examiner. He had the reference as prior art. That's all he would care about. And when they found out it was prior art, it would have been totally irrelevant to him. So there is no direct evidence of intent to deceive, and the district court tried to lay on a lot of other things, but they have no relevance, no reference, no nexus to the undisclosed raincoat scene. They don't provide any basis for an intent to deceive with respect to that so-called or supposed material prior art, which isn't even material. The district courts made a lot of errors, additional errors, in talking about the disclosed raincoat scene, which I thought this court dealt with adequately in its original decision. The district court was under a lot of misimpressions about inspirations for invention and the timing of the disclosure of the disclosed raincoat scene. I think this court dealt with those issues either implicitly or explicitly in the first decision and remanded only for consideration of the cumulative issue, which the district court did not do correctly because it applied the wrong methodology. If there are any other questions, I'll save my time. Thank you, Your Honor. Ronald Brzezinski for Esquel. Well, first of all, Judge Zille did exactly what he was asked to do by this court. He considered the relevance of the Robert German patent in regard to the undisclosed raincoat scene. As this court has said in Praxair, materiality is not analyzed in a vacuum. It is not dependent on a single element viewed in isolation. Rather, it is judged based upon the overall degree of similarity between the omitted reference and the claimed invention in light of the other priority for the exam. That's what he did here. Now, one of the things that we disagree with Tao is the waiver argument. We don't believe we've waived anything. The other arguments were in the first briefs. We interpreted the remand as what more do you have, and what more did we have? Well, we have the Vylene SL-33, the specific material which was found to constitute the violation of best mode in the last case. We also had the armhole scene as compared to a center placket scene. So there is more to it than just a structure. We don't even agree necessarily on the structure, but there's more to it there. It is... But I was under the impression that the first decision by this court essentially remanded for a determination on whether or not the Roebuck reference was cumulative. That's right, Your Honor. And to make a determination on that period. Well, we viewed this court's decision the first time essentially as that there was a three-legged stool, one leg being Robert's, one being the misrepresentations, and one being the litigation misconduct, and that this court thought that you needed all three to support the judgment of exceptional case and award of attorney's fees. In fact, what Judge Zille made clear in the remand is there are three stools, each one being sufficient and independent to support the finding of exceptional case and the award of attorney's fees. Those two other findings are undisturbed, the nondisclosure and also the litigation misconduct. And so what we're here about, I suppose, is the cumulativeness of Roebuck's, but as I say, the judge found that even without that, there still were independent grounds for the finding of exceptional case and the award of attorney's fees. Well, what about the intent factor? Well, we think there's a lot of intent here, Your Honor. Intent, of course, can be inferred, but there's also – Well, we've had a number of recent opinions covering the intent and the aspect of what it means and how far it needs to go for inequitable conduct. How do those cases impact the determination made by the judge in this court? Well, we have – you know, we – you know, there's – the Extigen, I guess, case, one of the more recent cases, which dealt with pleading of inequitable conduct, but talks about who, what, when, where, why, and how. We have that here. Who was John Wong, the inventor of the Taupat? What – he selectively disclosed information on prior armhole scenes by disclosing one scene, the so-called disclosed scene, while withholding all information on the second, more relevant scene, the undisclosed input scene. When? He had the knowledge prior to filing the patent application, and he made a selective disclosure and non-disclosure during prosecution of the Taupat. Where? Well, he was in a position as a factory manager to observe the scenes. He even deconstructed them – excuse me – during development of his claim scene, and he admitted that the examiner could not be expected to have knowledge of all those scenes. Why? To conceal the relevant information from the examiner. The district court already concluded Mr. Wong has little to no credibility. And how? By withholding the information from the patent attorney and from the patent office. But if his determination was made on the earliest determinations below, how does it impact his redetermination that Mr. Wong did, in fact, withhold evidence from the patent office? Well, Mr. Wong – if I understand. If I understand your question, Ron, forgive me. Mr. Wong testified that he knew that Tao had the relevant adhesive in a rank code as early as 1992, which is two years before the filing of the application. He testified that he took it apart. But he disclosed only to the patent office in a non-contentious proceeding the less relevant rank code scene and only disclosed the so-called undisclosed rank code scene during a deposition in a contentious proceeding. In his disclosure to the patent office in the 1996 amendment – and Tao says that the information in the amendment was given to the applicants represented by Mr. Wong when he visited the United States shortly before that amendment was filed. In that, he said that there was a different scene that had no set stitch but two top stitches. And he took the position that that scene was unacceptable for most garments, particularly for dress shirts. Now, most garments – and at the time, Tao was selling – five to six percent of its shirts were sold using that scene. And we say that's a false statement. Why is that a false statement? Because the most talks about most garments, but particularly for dress shirts. When you say particularly for dress shirts, in that context, you're talking specifically. The most doesn't apply to the dress shirts in that case, but particularly does. He did that twice. And yet, at the same time, he didn't disclose the other scene, the so-called undisclosed rank code scene, which was more relevant. It had the single top stitch and was used as used in most dress shirts. And he knew that. And that refutes the statements that he made. So what we have now is a Rule 56 violation of materiality, which is an even higher standard than the reasonable examiner. So we have intent. We have materiality. As I say, the non-disclosure. We have litigation misconduct. But was it the top stitch? You keep on insisting that the top stitch was only disclosed in the undisclosed aspect of it. Isn't it also covered by rovers? Well, two top stitches are, yes. There's a figure three in rovers specifically which shows a top stitch and a half stitch, just like his drawing of the allegedly undisclosed rank code scene. Yes, Your Honor. Exactly the same. Why isn't that cumulative? It may be as to that element, it is. But you can't look at just one element. You've got to look at other elements. You know, in their brief, Tao points to one of the steps, Step D of Claim 1. But I thought this court asked the judge and district court to determine whether or not the undisclosed aspect of the URS, as we called it in the record, was undisclosed and it was not cumulative with rovers. Right. And the court did exactly that. And the court said that in addition to what they had before, what they had was the byline SL-33, which had been withheld, the so-called BESS mode, which is per se material under the consolidated aluminum versus FOSICO case. You had that and you had the armhole scene, which was in the undisclosed scene but not disclosed to the patent office. So you had these two additional grounds, which the court said meant that the undisclosed rank code scene was not cumulative to rovers, even if they both had one top stage and one set stage. Well, one of the questions that I have, which I'm still trying to figure out, he relied on finding 81 from the original conclusions of law. And that particular finding was probably amended by this court's first decision. And it should have been reviewed at that level to determine whether or not finding 81 was still a valid finding. Did the district court make that determination? I don't have to find finding 81. It's on Joint Appendix 118. Finding 81 was the reason the executor would have considered the John Long undisclosed rank code scene important in deciding whether to allow the patent application because it contained it. All right, so that was a single stick. Was it amended by this? I don't believe it's contained in the findings, in fact, in the second opinion. So perhaps it is, but I would suggest to you that it's not necessary for your decision because the court's findings with respect to the other information, which was withheld. I mean, thermoplastic bonding element is present in every claim. Armhole seam is present in a number of claims. So there are a number of things that are in the claims that the court found were not present in Robert's, which are present in the undisclosed rank code scene. That was the mandate. I don't think the mandate said specifically to review finding 81, but we don't think anything that was in the original case was waived, the original finding. But does that go to the 1996 amendments to the application? I'm not quite sure as to whether or not he tied them all together on that basis. We should say he stitched them together. The 1996 amendment is significant because it's a disclosure of a seam, which is not, in fact, what was in the undisclosed rank code scene or in Robert's. It didn't have a top stitch and a set stitch. It had two top stitches. And he made the characterizations, or what we believe are mischaracterizations, to the patent examiner, saying that, oh, well, this would have been inappropriate for a dress shirt, when, in fact, it was used in a dress shirt, and would have been contradicted by the undisclosed rank code scene, which had that other feature along with the thermal adhesive, which is in every claim, and along with the armhole seam, which is very important. Remember, the judge reviewed the Robert's German patent on remand. He looked at the translations in German. He looked at the translation, which Tal itself presented to the patent office, and he found that what Robert's really pertained to were center plackets, this part of the shirt, and buttonhole seams, which was the only specific example that it gave, not two armhole seams, which is what was in the undisclosed rank code scene, which was an armhole seam of similar construction. So that part was important. But I thought that the 1996 amendment really went to the overlock type of a stitch. Yes, it did. That was the disclosure rank code scene. That was the disclosure. Right, that was the disclosure. I don't think the court ever really put the two together as to how that's material. I think what he put together as to material was the fact that he disclosed something which was less material than what he didn't disclose. And that what he didn't disclose refutes the arguments that were made with respect to why the disclosed scene wasn't relevant. But it still has to be a false disclosure, doesn't it? It is false, yes. Was there a determination of it being a false disclosure by the court? Forgive me. Yes, the judge found that the representation that the two top stitches were wholly inadequate for dress shirts was false. And on that basis, Mr. Wong, without material information from the Batten Office. Was that part of the 1996 amendment? Yes, that's what he's talking about. Because it's the 5% with the two top stitches. But that was the 5% to 6% that he was talking about for the dress shirts. Right, but that was a false statement. But there was no argument, though, that the overlock stitches were unacceptable in all applications. No, but it said... Only in most. Right, only in most. But it was, again, the context of most. The most is followed then by a comma and it says particularly shirts or particularly dress shirts. So whatever most meant in that context, I think the more significant word is particularly. Because particularly means specifically. So he's drawing attention to the fact that, oh, this is not important to dress shirts. You wouldn't use this in a dress shirt. It was wholly inadequate to be used in a dress shirt. When, in fact, they're selling dress shirts. But there was evidence in a record that indicated that the overlock stitch was no longer being used in 94% of the shirts. That's right, but it wasn't being used in five or six. So with regard to the particular language, it wasn't a false representation. And misleading in that regard, was it? I think it was false. Misleading would be enough particularly in this instance. Remember, Your Honor, what we're doing, I have 22 seconds. I'll just say this quickly. You're dealing with a situation. You're before a patent examiner. This is not a piece of prior art. That's a patent or a printed publication. This is not something you can hand to him where you don't have to characterize it. You can just hand it to him and he or she can then look at it, turn it around and say, well, this is relevant or unrelevant or whatever. This is a representation you're making to a patent examiner about something which was a piece of prior art, and we submit that you have a real duty at that point in time. You have a duty to be truthful. You have a duty to be complete, and they weren't in this case. Thank you, Your Honor. Thank you. Mr. Rush? I can start by answering Judge Gaiars' question about finding or conclusion of Law 81. The judge didn't review that, didn't correct it, didn't do anything, but he did cite it again in his decision after remand at page 18 of his order, which is JAS 19. He cited it as virtually his only evidence of an intent to deceive, but it didn't contain anything that was even relevant at this point, because as Mr. Grzeski just admitted, Roberts disclosed that same one set stitch, one top stitch that was the subject of Conclusion 81. So he didn't review it. He just blindly relied on it. And on the subject of intent to deceive, as I said in our reply, we put out a challenge to Esquell in our main brief that there was no record evidence suggesting an intent to deceive, nothing that provided even a motive for Tal to want to deceive, because Tal knew from an early point in the prosecution that what the examiner was focused on in evaluating the claims was the particular folds that were involved in the Tal seam and the positioning of the adhesive, not the type of adhesive, not whether it was polyester or something else or polyamic. He wasn't concerned with that. He was concerned with the positioning of the adhesive with respect to those folds, and that's made clear in the prosecution history, which both the district court and Esquell totally ignore. But Tal knew what he was thinking, so they had no reason, no motive whatsoever, for not telling him about more specific things, such as was it a polyamid or not, was it an armhole seam in a raincoat or not, because those things were totally immaterial to the claims, and they also knew they were totally immaterial to the examiner's reasoning processes and what he was looking for. And what he did not find and is not present in any raincoat seam is the particular folds that he was looking for and the particular placement of the adhesive with respect to those folds. That is nowhere in any of the prior art. That's why the court had to find the claims non-anticipated and non-obvious, and that ruling sticks. There's just nothing in that prior art that is in any way relevant or material to patentability. This whole inequitable conduct issue is a scourge, nothing else. Before I close, I'd just like to say something about the alleged litigation abuses. I think we covered that in a brief. There was nothing out of the ordinary here. Dropping claims as litigation progresses, as discovery happens, as court orders require, that's all commonplace. There's nothing unexceptional about that. There's nothing exceptional about that. There's nothing exceptional about any of the other things as well as pointed out. We've covered all of them in our brief. There's nothing more to be said. I thank you very much for your attention, unless you have a question. Thank you. The case is submitted.